UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOSEPH MASSUCCO,

        Plaintiff,

     v.

GROUP HEALTH COOPERATIVE OF PUGET SOUND,

        Defendant.

CASE NO. C05-342JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on a motion for summary judgment (Dkt. # 30) from Defendant Group Health Cooperative of Puget Sound ("Group Health"). The court has considered the briefing and documentary evidence, and has heard from the parties at oral argument. For the reasons stated below, the court GRANTS Group Health's motion.

## II. BACKGROUND

Plaintiff Joseph Massucco worked at Group Health as a systems programmer from 1998 until he resigned in August 2004 in lieu of termination. He worked in the Tandem Technical Operations and Support ("TTOS") group, which was responsible for maintaining Group Health's "Tandem" computers. The Tandem computers ran an

ORDER – 1

application called "Last Word," which supported Group Health's accounting, billing, patient appointments, and daily diet and medication schedules for inpatients.[1] Other computer systems maintained Group Health's patient charts and prescription information, although the Tandem computers connected to those systems to obtain information to generate daily instructions for inpatient meals and medication. Although the Tandem computers and the Last Word software were a convenient means of organizing vital patient information, they did not store such information. If the Tandem computers were not operational, Group Health had backup procedures to ensure that patients were not affected, as Mr. Massucco admitted. Massucco Decl. ¶ 11.

At all relevant times, Mr. Massucco's immediate supervisor was Rick Dumas, the TTOS team manager. Mr. Dumas in turn reported to Mitch Turner, who was at all relevant times the Senior Director of Information Services. It is undisputed that Mr. Dumas openly displayed his Christian religious beliefs in the workplace. It is also undisputed that he made no effort to proselytize other employees.

There is no dispute that Mr. Massucco was skilled at the technical aspects of his job and worked long hours. These attributes won him praise.

There is also no dispute that Mr. Massucco was at times harshly critical of other employees in the TTOS group, including Mr. Dumas. In 2000, Mr. Massucco lodged a string of complaints about John Lambirth, a fellow system programmer. Mr. Massucco believed that Mr. Lambirth was incompetent and that his incompetence jeopardized the Tandem system. He relayed those concerns orally and in a series of e-mails to Mr.

---

[1] As the court must view the facts underlying this summary judgment motion in the light most favorable to Mr. Massucco, the court's recitation of the facts assumes the truth of all allegations for which he has provided evidence. See Porter v. Cal. Dep't of Corr., 383 F.3d 1018, 1020 & n.1 (9th Cir. 2004), amended by 419 F.3d 885 (9th Cir. 2005).

ORDER – 2

Dumas, who he felt was not managing Mr. Lambirth appropriately. In September 2000, he sent an e-mail to Mr. Dumas accusing Mr. Lambirth of deliberately sabotaging the Tandem system. Mr. Turner then intervened, and directed Mr. Dumas to issue a formal warning to Mr. Massucco that he was not responsible for management decisions, and that he should leave Mr. Lambirth to do his job. Later in September 2000, Mr. Turner met with Mr. Massucco himself to warn that his campaign against Mr. Dumas had to stop. Mr. Lambirth eventually transferred to a different work group.

In the months leading up to Mr. Massucco's termination, Kate Young, another systems programmer, became a focus of his criticism. Mr. Massucco believed that Ms. Young was unqualified and incompetent, and that she abused her vacation and sick leave. He also believed that Mr. Dumas did not manage Ms. Young appropriately.

On July 27, 2004, Mr. Massucco reported to Mr. Dumas' office for his mid-year performance review. Mr. Dumas based his comments on an evaluation form with collected input from employees in the TTOS group, but he did not show Mr. Massucco the form. At some point, Mr. Massucco saw part of the form indicating that he had received a score of "3 point something" (out of 5) in one category. Massucco Decl. ¶ 73. Mr. Massucco stated that the score was inappropriate, and that he and another TTOS employee should have received scores of 5. Id. Mr. Massucco also stated that he had seen Kate Young "skipping out of [Mr. Dumas'] office" recently, from which he inferred that she had received a good review. Massucco Decl. ¶ 74. Mr. Massucco said that it "cheapened" the evaluation process when inferior employees received good reviews. Id. Mr. Dumas stated that other employee's scores were not Mr. Massucco's business. Their confrontation escalated, Mr. Massucco "felt [his] blood pressure rise," and walked out of the meeting. Massucco Decl. ¶ 75.

ORDER – 3

Mr. Massucco went from Mr. Dumas' office to the Group Health human resources ("HR") department, hoping to speak to Mary Jane Gooch, the HR employee with responsibility for the TTOS group. Ms. Gooch was not in her office, so Mr. Massucco spoke to Gidget Sheppard, Ms. Gooch's assistant. According to Mr. Massucco, he told Ms. Sheppard that "Kate Young was being treated preferentially," and that "Kate and Rick Dumas shared a fundamentalist Christian belief and Rick felt a need to protect Kate." Massucco Decl. ¶ 76. He also stated that any problems that impacted TTOS were "vital to patient safety." Id. at ¶ 78. Mr. Massucco then went home.

Ms. Sheppard has no recollection that Mr. Massucco told her anything about Mr. Dumas' alleged religious preference or that patient safety was at issue. The notes she took during the conversation are consistent with her lack of recollection. There is no evidence that Ms. Sheppard communicated Mr. Massucco's complaints of religious preference and compromised patient safety to anyone else.

Later that day, Ms. Gooch telephoned Mr. Massucco at home to discuss the day's events. He claims that he complained to her regarding Mr. Dumas' religious preference for Ms. Young and said that Mr. Dumas' management of the TTOS group was a threat to patient safety. Ms. Gooch has no recollection of those comments, consistent with the notes she took during the conversation. As with Ms. Sheppard, there is no evidence that Ms. Gooch communicated Mr. Massucco's alleged comments to anyone else. The next day, Mr. Massucco called Ms. Gooch regarding his administrative leave status, and allegedly repeated his comments from the previous day. Again, there is no evidence that Ms. Gooch communicated any comment regarding religious discrimination or patient safety to anyone else.

When Mr. Massucco left Mr. Dumas' office on July 27, Mr. Dumas wrote an e-mail to Ms. Gooch and Mr. Turner stating that Mr. Massucco had "finally lost it." He

ORDER – 4

summarized Mr. Massucco's comments about Ms. Young. He did not mention religion or patient safety. He stated that he was concerned about Mr. Massucco's continued access to the Tandem system and that Mr. Massuccco had "become destructive to the team . . . ." He asked for Mr. Turner's and Ms. Gooch's input.

Mr. Turner decided to terminate Mr. Massucco on July 27, 2004. There is no evidence that any other employee could have overruled his decision, and no evidence that anyone attempted to do so. Mr. Turner's decision was based on, *inter alia*, Mr. Massucco's walking out of his performance review, and on reports from other employees that Mr. Massucco had made angry and threatening comments to other employees regarding Ms. Young. One employee sent Mr. Turner an e-mail on July 28, 2004 stating that "[i]n past conversations Joe has indicated that if he was ever fired or let go from Group Health he would come back with an AK rifle." Turner Decl. Ex. 5. Another employee told Mr. Dumas on either July 27 or July 28 that Mr. Massucco had suggested that an "AK-47" was an appropriate solution to problems at Group Health. Elwell Depo. at 73-75, 97.

Mr. Dumas agreed with Mr. Turner's decision after hearing from other employees regarding Mr. Massucco's behavior. He placed Mr. Massucco on administrative leave. He and Mr. Turner communicated with Ms. Gooch regarding the decision. On July 29, 2004, Mr. Dumas wrote the first draft of a termination letter. He collaborated with Mr. Turner and Ms. Gooch on changes to the termination letter.

On July 30, 2004, Ms. Gooch received a 14-page letter from Mr. Massucco. Massucco Decl. Ex. N. The letter focused on Mr. Dumas' alleged mismanagement of the TTOS group. Not until the third page did he mention Mr. Dumas' alleged religious preference for Kate Young, a theme he did not pick up again until the eleventh page, where he stated that the "only reason anyone can come up with why Kate has a protected

ORDER – 5

status by Rick is that she shares his obsession with Fundamentalist Christianity." Id. The letter stated that the Tandem system "affect[ed]" patients at Group Health, and later stated that "patients . . . rely on" the Tandem system. Id. at 1, 7. The letter concluded with a request that he resume his position without any reprisal or reprimand, that he receive a score of 5 on his performance review, and that he no longer report to Mr. Dumas as his supervisor. At some point, Ms. Gooch likely shared the letter with Mr. Turner and Mr. Dumas.

On August 4, 2004, Mr. Massucco met with Mr. Dumas, Mr. Turner, and Ms. Gooch. They gave him a choice between resigning and termination. They stated he was being fired for walking out of his review, as well as past disciplinary problems. Although Mr. Massucco chose to resign, the court will refer to his separation from Group Health as a termination.

Mr. Massucco claims that Group Health terminated him for complaining about Mr. Dumas' religious discrimination. He also claims that Group Health terminated him in violation of public policy because one cause of his termination was his complaints about TTOS issues that allegedly impacted patient health.

## III.  ANALYSIS

In deciding Group Health's summary judgment motion, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party meets its burden, the opposing party must show that there is a genuine issue of fact for trial.

ORDER – 6

Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must present significant and probative evidence to support its claim or defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991). For purely legal questions, summary judgment is appropriate without deference to the non-moving party.

**A.     Retaliation**

Mr. Massucco claims that Group Health terminated him at least in part because he complained of Mr. Dumas' religious discrimination,[2] and therefore retaliated against him in violation of Title VII of the Civil Rights Act of 1964 and the Washington Law Against Discrimination ("WLAD"). Under Title VII, an employee alleging retaliation must show (1) that he "engaged in a protected activity," (2) that the "employer subjected him to an adverse employment action," and that (3) "a causal link exists between the protected activity and the adverse action." Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000). The requirements under Washington law are similar, except that a plaintiff need only show that retaliation was a "substantial factor" leading to the adverse employment action. Washington v. Boeing Co., 19 P.3d 1041, 1049 (Wash. Ct. App. 2000).

---

[2]Group Health contends that Mr. Massucco's allegations regarding Mr. Dumas' preferential treatment of Ms. Young were not allegations of religious discrimination. At oral argument, counsel for Group Health cited Ennis v. Sonitrol Management Corp., No. 02-CV-9070 (TPG), 2006 U.S. Dist. LEXIS 2599 (S.D.N.Y. Jan. 25, 2006). The Ennis court succinctly pinpointed the error in Group Health's position when it remarked that a retaliation "plaintiff need not establish that the conduct he opposed was actually a violation of Title VII, but only that he possessed a good faith, reasonable belief that the underlying employment practice was unlawful." Id. at *44 (internal quotation omitted); see also Ellis v. City of Seattle, 13 P.3d 1065, 1071 (Wash. 2000) ("A reasonable belief by the employee, rather than an actual unlawful employment practice, is all that need be proved to establish a retaliation claim."). In this motion, the court must accept Mr. Massucco's declaration that he believed Mr. Dumas had engaged in religious discrimination, and may not usurp the jury's role in deciding whether his belief was reasonable.

ORDER – 7

Case 2:05-cv-00342-JLR   Document 54   Filed 04/05/06   Page 8 of 11

Under both Title VII and the WLAD, retaliation claims are subject to the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Mr. Massucco must first provide evidence establishing a prima facie case of a retaliatory adverse employment action. If he succeeds, the burden shifts to Group Health to provide a legitimate explanation for the adverse employment action. If Group Health satisfies its burden, Mr. Massucco must provide evidence demonstrating that Group Health's proffered reason is pretextual. E.g., Ray, 217 F.3d at 1240 (9th Cir. 2000) (analyzing retaliation claim); Allison v. Housing Auth. of City of Seattle, 821 P.2d 34, 39 (Wash. 1991) (applying McDonnell Douglas to retaliation claim under WLAD).

Mr. Massucco cannot make a prima facie case of retaliation because he cannot provide evidence of a causal link between his termination and his complaints of religious discrimination. As the court has noted, Mr. Turner undisputedly decided to terminate Mr. Massucco before word of Mr. Massucco's religion-based complaints had reached him. Mr. Massucco's only evidence that his complaints about religious preference were a causal factor in his termination is that Ms. Gooch knew of his complaints. Ms. Gooch, however, did not make the decision to terminate.[3] Mr. Turner made the decision, and he undisputedly did so without knowledge of Mr. Massucco's religion-based complaints. At the earliest, he knew of Mr. Massucco's complaints late on July 30, 2004. By that time, the decision to terminate him was a *fait accompli*. Whatever the basis for Mr.

---

[3] Mr. Massucco intimates that Ms. Gooch had decision-making authority over his termination. Ms. Gooch's testimony is directly to the contrary. Gooch Depo. at 236 ("I'm not a decision-maker in this process, I'm an adviser."). The question, however, is not whether Ms. Gooch had decision-making authority, but whether she exercised it in Mr. Massucco's termination. While Ms. Gooch participated in the decision-making process, there is no evidence that she made the decision to terminate him or influenced Mr. Turner when he made the decision.

ORDER – 8

Massucco's termination, no reasonable jury could infer that his complaints of religious discrimination were a causal or substantial factor.

**B.       Wrongful Termination in Violation of Public Policy**

Washington recognizes a cause of action for wrongful termination in violation of public policy.  To prevail, a plaintiff must prove three elements: (1) the existence of a clear public policy, (2) proof that discouraging the employee's conduct would jeopardize the public policy, and (3) proof that conduct related to the policy caused the employee's dismissal.  Hubbard v. Spokane County, 50 P.3d 602, 606 (Wash. 2002) (citing Gardner v. Loomis Armored, Inc., 941 P.2d 377 (Wash. 1996).  If a plaintiff proves the first three elements, the burden shifts to the employer to show that it had an "overriding justification for the dismissal."  Id.

The court assumes for purposes of this motion that Washington has a public policy encouraging employees in the health industry to raise complaints about compromised patient health and safety.  The court further assumes that to terminate an employee for making such complaints would violate public policy.  The court concludes, however, that Mr. Massucco has not offered evidence from which a jury could conclude that his complaints about compromised patient health and safety were a cause of his termination.

Mr. Massucco faces the same difficulties that were fatal to his retaliation claim when he attempts to causally link his purported policy-related complaints and his termination.  In his July 27-28 conversations with Ms. Sheppard and Ms. Gooch, he allegedly made specific allegations that Mr. Dumas' management of the TTOS system could compromise patient health.  He repeated those assertions in his July 30 letter to Ms. Gooch.  As with his religion-based comments, however, there is no evidence that these comments reached Mr. Turner before he decided to terminate Mr. Massucco.

ORDER – 9

Mr. Massucco's public policy claim presents one wrinkle absent from his religion-based claim. As the court has already noted, there is no evidence that Mr. Massucco had complained to management about Mr. Dumas' alleged religious discrimination before July 27, 2004. There is evidence, however, that Mr. Massucco had complained about John Lambirth's incompetence and the concomitant potential impact on patient health in 2000. E.g., Massucco Decl. ¶¶ 30, 44. Mr. Lambirth transferred to another department, while Mr. Massucco retained his job. On this evidence, no reasonable juror could find that Mr. Massucco's complaints in 2000 were a causal factor in his termination in 2004. There is no evidence of a complaint about compromised patient health between 2000 and Mr. Massucco's July 2004 complaints. Although Mr. Massucco complained about Ms. Young's frequent absenteeism before July 2004, there is no evidence that he claimed that patient health was at risk. The court cannot, as a matter of law, treat Mr. Massucco's complaints about his co-workers' incompetence as complaints about risks to patient health. Under that logic, every health industry employee's criticisms of his or her co-workers would morph into a protected policy-related complaint.

The court finds that Mr. Massucco has presented no evidence that a reasonable juror could use to link his policy-related complaints to his termination. The court need not address the remaining elements of his claim for wrongful termination in violation of public policy.[4]

---

[4] The court notes that there is compelling evidence that a failure in the Tandem system would not jeopardize Group Health patients. E.g., Turner Depo. at 26:15-16 ("I don't believe that anything would happen to patient care if the Tandem computer was not available."); see generally Turner Depo. at 24-29. Mr. Massucco admitted that backup systems were in place to prevent any adverse impact from a failure. Massucco Decl. ¶ 11. Nonetheless, Mr. Massucco has provided evidence that he believed that a Tandem failure would put patient health at risk. E.g., Massucco Decl. ¶ 78. Although the law is not settled, Washington courts have held that an employee may establish the "jeopardy" prong of a public policy termination claim by showing that he has an "objectively reasonable belief" that public safety is at risk. Ellis, 13 P.3d at 1071.

ORDER – 10

## IV.  CONCLUSION

For the foregoing reasons, the court GRANTS Group Health's motion for summary judgment (Dkt. # 30).  The court directs the clerk to enter judgment for Group Health in accordance with this order.

Dated this 4th day of April, 2006.

_____
JAMES L. ROBART
United States District Judge

---

Here, Mr. Massucco may have failed to prove that he had an objectively reasonable belief as a matter of law.  Because his claim fails on an independent ground, the court need not decide the issue.

ORDER – 11